Court. It is Amran Holding Group, Inc. v. U.S. Court. Ms. Santora, I've now lost my cheat sheet in terms of how much time you wanted for rebuttal. What was it? Five minutes, Your Honor. Okay. You may begin. May it please begin. Thank you, Your Honor. I'm going to start with the court. We asked the court today under Sandoval Standard of Review, which is the applicable standard, to determine that the government did not meet its burden to obtain summary judgment before the trial court. And the reason for this, Your Honor, is that... This is a procedural point. Yes. As I read your opposition to the government's summary judgment motion, it never said there is a triable issue of fact and we want a trial. It was rather the government is wrong in seeking summary judgment. We're right in seeking summary judgment, full stop. So, I mean, is there on the state of this record a who's right as a matter of law question in front of us? Your Honor, we would say that the main contentions are ones of law. That being said, we understand there are dueling motions, but we wouldn't ask this court, given the evidentiary standard before it, to say that we are absolutely right and the government is absolutely wrong. We would say that there are enough gaps and ambiguities in this record to require further evidentiary proceedings before the trial court. Now, as I understand it, government contractors have to, if they allege an ambiguity in the contract, they have to argue that the ambiguity is either patent or latent, right? Correct, Your Honor. So, is your position that it's a latent ambiguity? Yes, that's correct. Right. And that would mean, as I understand it, that you would have to establish not only that there's a reasonable interpretation that's different than the government's, and that's what you spend a lot of time on, but you'd also have to establish that you relied upon that ambiguity in terms of preparing and submitting your bid and entering into the contract. Isn't that right? Yes, that's correct, Your Honor. All right. So, did you present any such reliance evidence? Your Honor, our contention would have been, and I believe this is in the briefs, that Omran would have relied on a rate that was publicly available. Initially, Omran had believed that that was the Bank of Afghanistan rate that you see in the initial pleadings, the initial claim that we relied on for our officers' decision, saying, no, the Treasury sets the rates, and therefore, you should look to the Treasury for this. Doesn't that kill your reliance argument, though, if you were relying on a mistake of fact? So, you weren't relying on the fact that it was the Treasury rate, you were relying on the fact that it was some other rate that you now admit couldn't have been right. I don't believe that's exactly correct, Your Honor. We were relying on a prevailing rate, a known rate, a publicly available rate. At the time, again, we believe that was the Bank of Afghanistan rate, but irrespective, it was a market-based rate. That's what we reasonably assumed when we entered into the contract. And that could be, again, the Bank of Afghanistan, the Treasury rate, and those rates aren't materially different in what they would have offered. What is materially different is the undisclosed ITS.gov rate that the government contends was the properly applied, quote-unquote, official rate for purposes of this clause. So, whatever rate you relied on, was it to your detriment? Yes, Your Honor. Under either the Bank of Afghanistan rate or the Treasury rate, which are both different iterations of the prevailing rate, the difference between, and these are three contracts, I should add, that are at issue in this appeal, the difference would have been about $1.5 million. Slightly less under the Bank of Afghanistan rate, but still on the same ballpark. Did you present any evidence in the record that there could be any other possible rate, other than the 3%, 5%, and the Treasury rate? We believe, Your Honor, that the government has admitted as much. They introduced into the record a declaration of Mr. Walker Wood, actually two declarations of Mr. Walker Wood, who works for ITS.gov. And what Mr. Wood testified to through his declaration is that ITS.gov offers multiple rates to the government and doesn't advocate for any particular one or ones. And that option is essentially one to the government to tell ITS.gov. But did his testimony say that there were multiple rates or that as between the 5% and the 3% there was flexibility? It said I'll look at the declaration if that would be helpful. And I'm at appendix page 157, and paragraph 6 of this declaration, ITS.gov provides multiple rate options, including spot or advanced rates capabilities for federal agencies to use foreign payment processing. Federal agencies are free to choose what rate option they will use, and that selection is configured by ITS.gov. And then moving on, ITS.gov does not approve, deny, or otherwise mandate participating federal agencies' use of an ITS.gov established rate structure. So while the court certainly seemed to come to the conclusion that it was either the five-day rate or the three-day rate, that certainly is left open and ambiguous in the court. The five-day, that was, no, excuse me, the three-day that was actually applied was more favorable by... More favorable overall, but weren't there a couple instances in which the three-day was less favorable than the five-day? There were two individual payments that would have been more favorable under the five-day rate. And what would have been the value difference as to those two individual payments? Nominal, Your Honor. Okay. How, I mean, one of my problems is that the language of the contract, whatever it means, does talk about the DOD finance office, local DOD finance office. And how do you equate the Treasury with the Department of Defense? We wouldn't, Your Honor. I believe what our argument was before the trial court is that there is no posted rate promulgated by the DOD local finance office, irrespective of how you define local DOD finance office. As Your Honor is aware, there was kind of this issue where the government posited that at three different occasions that location changed. First it was Apache, then it was the 368th Battalion at Bagram, and then the 159th again at Bagram. None of these locations are where Omar was actually performing contract work. And given the contracting officer's statement that the local office is Millington, Tennessee, they would have no reason to even search out these alternative locations. Did you ever ask the contracting officer to explain that term, to explain what rate was applicable? In our claim, Your Honor, in the initial claim we had posited that there was no correct rate applied, and in response to that, the contracting officer said there is no local DOD finance office in Afghanistan, in the entirety of Afghanistan. Both parties now agree that that is incorrect and logically wouldn't be a correct interpretation of the contract laws. So that was true. At what point in time did they start posting these things at Bagram Air Force Base? The government affidavits indicate that according to the person who declared it was replacing, this was ongoing for the entire contract period. I'm not sure we have an affidavit that covers the very early on contract payments from a person with firsthand knowledge. However, they've given us one sample of how they posit they posted or fixed these rates to the bank teller. Is there evidence, what I'm trying to figure out is the point in time, is there evidence that anything at Bagram was posted before you started down the road of having a claim dispute over this issue? There is a declaration from one of the individuals at Bagram, I believe Bagram, maybe also Apache, that says that it was their standard operating procedure to affix a piece of paper to the bank teller window at the base, essentially for military banking transactions. So if someone who comes onto the base for a financial transaction who has access to the base, they would see the rate at the time it was being applied, which logically makes sense, Your Honor. But they didn't say when that standard operating procedure started? I believe, in fairness to the government, they posit that it was the entire contract period. That's declared. We don't have any evidence, every single quote-unquote posting, that the government posits were under this clause. Do you accept the proposition that that bank teller at an Air Force base in Afghanistan is the equivalent of the local DOD finance office? Your Honor, it's ambiguous. The clause doesn't define what constitutes a local finance office, and we would suggest that having a location somewhere in the country that the contractor isn't informed of and can't access would not satisfy the purpose of that posting requirement in the clause, in the contract clause. What are you upset about? The rate that you received, or the fact that this ambiguity existed? I would say both, Your Honor. I would say that Omran is most aggrieved by the fact that it doesn't... I mean, would you be here if you had received an unfavorable rate and the ambiguity existed? Obviously, if we believe that the railing rate was in line with what was paid, we wouldn't be here today. I think what Omran is truly aggrieved at... At the time of the bid, you submitted your bid, but you didn't know that. You didn't know what rate was going to apply, correct? That's an interesting question, Your Honor, because the Centon clause that's at issue in this case says that when a contract is awarded to a host nation vendor, such as Omran, it should be awarded in the local currency. In this case, it appears that an error occurred at the onset, resulting in the contract being awarded in the U.S. dollars, potentially creating this whole issue that we're discussing today. It would seem logical that if it was correctly awarded in the host nation currency, Omran would submit progress claimants against that amount. Do you argue you should have been paid in Afghanis? I believe both parties are in agreement that we should have been paid in Afghanis. The question is that when Omran submitted for payment, it was requested to do so in dollars and then it got converted to Afghanis. And at that time, what rate were you suggesting that they used, or did you believe it was going to be used? Omran is in agreement that the rate would fluctuate across the contract period, depending on when it submitted its request for payment. The question again is whether the rate that was used is in any way fair to Omran, given their lack of notice and the fact that it differs from prevailing rate that could be known by any parties at the time. So why did you give up on the local exchange rate argument in favor of this treasury argument? The understanding, Your Honor, was at the time that the contracting officer would be correct. We were understanding that they were telling us that the treasury sets the rates, and therefore we looked for a posted rate by the treasury. And having found one, we determined that we had satisfied what the contracting officer was referencing. And of course, that rate, which we found, the quarterly treasury rates, which are available on the treasury's website, are in line with the Bank of Afghanistan rates, a little bit more favorable. So we adopted that as being in substantial compliance with what the contracting officer was telling us would apply. And then comparing that to the payments we received, obviously there was a disconnect, which is where we kind of got this treasury rate argument from. And then reading the government's cross motion, once we got to the trial court, it also seemed to fit squarely in line with what the FMR, the financial management regulations for DoD, would suggest are proper. And we can kind of get into this issue of, I see I'm kind of running out of time already. This issue of whether the government purchases currency, and therefore whether the acquisition rate would be the official rate that applies under Chapter 12, we would posit that it is. And we would also say, as a factual matter, to answer Judge Taranto's question from before, one of the issues that we find contradicted in the factual record is Lieutenant McManus's testimony. Therefore you can't do a cash transaction without having purchased Afghani currency. So having established that factual contradiction, or at least factual question that hasn't been fully developed, we would say that Chapter 12 of the FMR specifies that the acquisition rate be the official rate. And when you look at the Treasury's website, once again, it states that the acquisition rate provided by dispersing officers is the quarterly rate, which kind of gets us back to the point where we thought we had reached the contracting officer's interpretation. And what do we know about the relationship between the dispersing officers and the DoD finance offices? I believe Lieutenant McManus is a dispersing officer. So we have in the record some of that testimony. The dispersing officers appear to work directly at the local, what the government posits, are the local DoD finance offices. Your Honor, I seem well into my time for rebuttal, so I'll stop right there. All right, we'll give you two minutes for rebuttal. Thank you. May it please the Court. The trial court's decision that Amran failed to establish that his ODE damages should be upheld, because undisputed evidence shows that the three-day rate that Amran received is more favorable than the five-day rate, which is the rate that applies pursuant to the contract that caused that issue. Well, it's true that that wasn't true, and it wasn't true in every instance. There may be small amounts, but there were at least two instances in which the five-day  To be clear, what I'm saying, Your Honor, is that over the 60 payments at issue, between June 2013 and August 2015, 58 out of those 60 were more favorable. So in the aggregate, when you aggregate all the payments at issue, Amran received more money. Well, that's assuming, A, assuming we're aggregating. But more importantly, that's assuming we only have a choice between three and five. And the whole point of this case is that there are alternatives. That three and five are not the only two options. Yes. Unless we conclude that the contract is unambiguous. Well, there are not more than two alternatives. Because the issue is, one, what is the rate required by the contract? And the contract is unambiguous that the rate that will be determined under the contract is the rate that is posted by the local DOD finance office for each payment in accordance with it. Well, I'm having a hard time with this notion that it's unambiguous. Because the government was all over the place in terms of what the rate was. The contracting officer said one thing. You had different positions between the three and five percent. I mean, how can you say it's completely unambiguous when you can't seem to land on a definition? Well, we did land on a definition. Well, when you finally got to the Court of Claims, you decided to land on a definition. That's right. And there was no question that the contract... But you had to land on that definition with the assumption that that definition was unambiguously required by the contract. Well, absolutely. Look, there's no question that the contracting officer got it wrong, saying that there is no DOD finance office in Afghanistan, saying that it's in Millington, Tennessee, which is where the Cora's finance office is. That was wrong. Both parties agree it's wrong. It doesn't make sense when you read the plain text of the clause where local means Afghanistan or Afghani. So clearly we're talking about a DOD finance office in Afghanistan. Is there actually an office that's titled DOD financing office? Or is it simply a place where someone comes to a bank teller's office? Right. But we have uncontroverted evidence, a declaration from Captain McManus, that there are two army, just DOD, army finances, finance offices in Afghanistan. There's no contrary evidence that there are any other finance offices in DOD, finance offices in Afghanistan, other than the two that are identified in a declaration by Joseph McManus, First Lieutenant McManus. That's uncontroverted. Second, there's only one DOD, that is to say army finance office, that has posted an exchange rate. And it's because there's only one finance office that has posted, during the entire payment period from June 2013 to August 2015, there's a single DOD finance office that has posted the five-day rate every week for the entire period in question. That makes it unambiguous, Your Honor, because there's no contrary evidence that there's any other DOD finance office out there that's posting a different rate. I would agree, this would be a different case if you had a DOD finance office, let's say two DOD finance offices, and one is posting a three-day rate, one is posting a five-day rate. But your argument is that basically we created a set of facts that would satisfy the language in this contract. But we're supposed to look at the language on its face to determine if it's unambiguous. No, Your Honor, I would disagree with the characterization that we created. We didn't create facts, we procured testimony under oath, which again, the plaintiffs in their motion for summary judgment did not attach a single piece of evidence, no testimony, they didn't take a single piece of discovery controverting us. So this is undisputed. And so it's not that we created it, this is facts under oath that there's one DOD finance office, and it's a single rate, five-day rate, that's been posted the entire period. That's dispositive and that's uncontroverted. And so for purposes of determining whether or not it's an ambiguity, yes, we concede that you cannot determine what rate, what the actual rate is simply by reading the text of the class. You have to understand what... Right, and you concede there's no publicly available rate. I mean, even the contracting officer, even the contracting officer didn't know about this rate. Well, yes, well, the contracting officer got it wrong, there's no question. But what I'm saying, Your Honor, is that even though the rate is not in the clause itself, it doesn't say the rate is X, it says the rate will be determined by the local DOD finance office, and we have produced uncontroverted evidence during the entire payment period as to what those rates were. For each payment period, there is no issue of fact as the trial court correctly held that that is the rate that applies for each of the payments at issue, Your Honor. Maybe even the central theme, but an important theme of the other side's position is that there is something extremely strange, that's not a legal term, but extremely strange about saying the rate is one that we can't know, only the other side can know. Can you say either way? Take it a little bit. Explain why that's not strange. Sure, well, it's not the rate that they can't know. I disagree with the premise of the rate they can't know. One, they argue, at oral argument below, the trial court, the Blue House Ministry of Information said, oh, we had no access, Omron had no access, it was unauthorized. That's not in the record. One, factually, there is no affidavit from anybody from Omron saying we can't access it. So that's not something that's before the court. There's no judicial weight that has to be afforded to those statements. But first, prior to that... You're the one who asked for summary judgment. You didn't put any evidence in that they could access it, right? We both went for summary judgment, and yes. And so the prior question, regardless of whether or not they had notice or not, the first question is whether or not the contract requires that they have that notice, and the contract doesn't. So A, they have no access to it. B, they asked the contracting officer, and the contracting officer had no access to it, and didn't even know it existed. Well, as a matter of... This is an issue of contract administration. And there's no evidence that Omron asked before they filed a certified claim what the rate was. So yes, on a particular day, they asked the contracting officer during the certified claim, where's the DOD finance office, and the contracting officer got it wrong. But the point, Your Honor, is, is it a contractual requirement that they have notice as to what the rate is? And the answer is no. The rate is determined... Can you just... I tried to ask you a question. Common sense or factual? I know your position is we don't care under this contract, on this record, whether they couldn't have access or not. Tell me why if it's... Give me an intuition about why that's not very straight. Okay. Well, first, the issue... The only issue, really, that there is... The legal issues, I think, are on our side. The issue is a matter of how could we know what the rate is? It seems unfair that we have to pay a rate and we don't know what it is. And as a matter of contract administration, you have a client who has a relationship with a contracting officer or a contracting officer's representative, and it is the contracting officer's representative to say, as we have here, we have a picture of what the rates are. If for some reason you can't access the base or you can't access the personnel at the base, let me send you evidence of what that rate is. That should have happened in this case. No question about it. The contracting officer... I didn't mean to interrupt you. No, no. So there's some idea here that there's a relationship between the contractor and the contracting officer that can effectively supply information that they may not be able to get directly. If it's true that they can't access the base, that they can't access the contracting officer, who should be able to tell them, as we did in this case, here's a picture. We can tell you what the rates are. We can give you a picture of what's posted. You didn't tell them until after a claim was made. The contractor made a mistake. There's no question. They raised it in their certified claim. They didn't raise it during the payments at issue. They filed a certified claim, and the contracting officer at that time, not during the earlier administration of the contract, gave them incorrect information. That's correct. That's not dispositive here for the reasons I mentioned, Your Honor, as to who should win, as to whether or not they have contract damages. This is really a case about contract damages. There's no question that the government's position is that the five-day rate controls, and there's no question they don't dispute, as you heard Ms. Santora say, that the three-day rate is more favorable. The rate they received is more favorable. They weren't damaged. They benefited. Not by much, but they benefited. The question that you're focused on is, where's the fairness if they don't know what the rate is? Putting aside what I said earlier as to, there's no evidence they didn't know, but assuming they didn't know, theoretically, they could figure this out. Let me ask the question this way. They make this point, they don't exactly feature it, but I'm not sure that matters. You read this claim language, and you say, huh, I wonder what that is. So your position ends up being, because you have McManus's declaration, and nothing contrary, that there are these three-day, five-day rates, and only one of them was posted, and there's no evidence they didn't know. There's nothing else to consider. They make the point, if we're trying to figure out what the right meaning of this slightly odd term is, why don't we start with McManus saying, there's an actual exchange rate being, there must be dollars exchanged for Afghanis, and one of those rates is higher. Don't they have some point that, and you distinguish it, and I think the CFC distinguish it as saying, that's not really this kind of exchange rate, that's about conversions. Why shouldn't the conversion rate be a meaningful way of interpreting this statute? I agree, yes. That's the point, Your Honor, is that this case, as the trial court below correctly stated and found, is about currency conversion through the ITS.gov system, which is a way you convert dollars to Afghani. There's another mechanism. I think I'm not asking the question right, and so you're going to have to help me. You understand this record, I don't have the details. They have some argument about, and there was something in the CFC opinion about cash transactions or something and wrong rate, wrong kind of thing, that's not about context. Can you address that? Yes, let me try to explain the context of that. We'll start with Armand's argument. Armand's argument is that this contract is the biggest... Can you just answer the question? I'm trying, Your Honor. It's pretty straightforward. Make sure I understand your question, because your question was that there was some discussion in the trial court about the difference between purchasing currency versus converting. That's what I'm trying to get at. I'm going to assume here that other rate is more favorable to them than either this three or five day thing. You don't have to assume that. They agree that the three day rate is more... They want that other rate, and the CFC said no, no, no, wrong rate. Can't possibly be.  They want the treasury quarterly rate. I paused if I didn't understand your question. You're asking about the treasury quarterly rate and why that does not apply according to the government. What about the cash exchange rate? The cash exchange rate. That's what I was trying to answer, Your Honor. I thought you were asking about their argument that there's a reference in Chapter 12 of the FMR, the Department of Defense Financial Balance Regulation, concerning the purchase of securities and a reference to an official rate, and that official rate is not the five day rate conceded. And what the trial court said, what we argued the trial court agreed, and we have evidence to that fact, this case does not involve the purchase of currency. It involves the conversion of currency. These are two different transactions. This case involves conversion, so it means the core providing a dollar amount through ICS.gov, and then the Afghani amount that corresponds to that is then transferred to an Afghani bank for the benefit of Omron. So what is the default official rate under the regulations? I mean, you can argue that it doesn't apply to the contract, but under the regulations, what would be the acquisition rate that's defined in the regulations? Acquisition rate under the regulations. That's a rate that would apply in the context of a purchase of securities, so where a dispersing officer has a limited depository account and purchases securities and then pays vendors through that. As we've shown, though, however, the dispersing officer, Kevin Heath, has an affidavit saying there are only three currencies for which the core has done that. The won, the yen, the euro, not the Afghani. That's not what's going on here. You don't have purchase going on here. You have conversion through ICS.gov. The five-day rate that was posted during the entire payment period is the official rate per the contract, and Omron concedes that the rate they received is more favorable than the five-day rate, which is the contract rate. Therefore, they have no damages. They, in fact, benefited from the fact that the core used a more favorable rate than was required by the contract. And so the distinction that the trial court addressed, Your Honor, Judge Toronto, that you're asking about between the purchase of securities and conversion, because they're relying upon a provision that talks about the acquisition rate, which is a rate applying to the purchase of securities. Again, there's uncontroverted evidence that there was no purchase of securities here. None of Omron's payments were made as a result of the purchase of securities from a limited depository account. It was made through conversions of dollar amounts through ICS.gov pursuant to the three-day rate, which is more favorable than the five-day rate. So what we have is you enter into contracts, and then you decide later what you're going to pay them? Because you can set the rate at whatever you want. Oh, no, I don't set it at whatever I want, because it's set the dollar amount... It's not a hard and fast set. It is. Well, it's not hard and fast because by contract... There's flexibility. I mean to talk over you, Your Honor. There's flexibility. So, in other words, you've got a contract. You enter into a contract that says we're going to pay you and we're going to pay you at an official rate and then we're going to decide later whatever that official rate is. Well, no, what the contract says is that the currency... This is the exact words of the contract. The contract says that the currency exchange rate will be determined at the official exchange rate that is posted by the local DOD finance offices for each payment in accordance with DOD regulations. So in the contract language itself, which is a contract clause at issue, the rate that will be determined is the rate that is posted by local DOD, and we entered in evidence that for Afghanistan, in fact, for the Middle East, they're actually... The Army has chosen the five-day rate, and for the entire payment period, it had no option other than to use to post the five-day rate, which I'm a DOD... What would we make of the fact that the contracts have now been changed to set a specific rate? I'm sorry, what was the first part of your question? What would we make of the fact that now, in your contracts, you set a specific rate? Oh, nothing. Well, if it was so unambiguous... No, it's nothing because... Why did you bother to change the contract? Can you let me finish? I apologize, Your Honor. I apologize. You don't have to get angry because I'm asking a question. I'm not angry at all, Your Honor. I'm sorry. So, what do we make of the fact that if it was so incredibly unambiguous, the government now felt the need to change the contract to set a specific rate? Well, Your Honor, one, it's not clear to me, and I posit, I did not mean to talk over you, and I'm certainly not angry. The different language that they cited in their brief, like, oh, now there's a different clause out there, which does not have this language about local DOD posting. In fact, it's going to be a different rate. That's true. That change was made. There's no evidence in the record as to why that was made, but more importantly, Omron has conceded that that clause doesn't apply. It's not a clause that is incorporated into any of the three contracts at issue, and there's no inference, no reasonable inference can be made that that change was somehow made because there's some ambiguity with respect to what the local DOD finance office is because there is no ambiguity with respect to what the local DOD finance office is based upon the fact that there has been only one Army finance office during this entire period that's posted a single five-day rate for all 60 payments at issue, so there is no ambiguity as to that, and because there's no ambiguity as to what rate applies under the contract, the five-day rate, and there's no disputed evidence as to the three-day rate that's more favorable to what they received, they are not entitled to any damages because the court decided to give them that more favorable rate. I think I may at least be getting a little closer to understanding my own question before. The acquisition rate, this is where I think at page, appendix page 7, CFC is on page 6, I think the CFC relies on Mr. Keith's, who's a core dispersing officer, testimony that that acquisition rate, the one that is more favorable than either the five-day or three-day, wouldn't apply to Afghanis at all, I mean Afghanis as a currency, that's right. But only for the Yuan, Yen, and Euro? Yes, Your Honor. That's his testimony, he's dispersing officer of the core, saying we do purchase securities in certain limited circumstances with the Yuan, the Yen, and the Euro, not the Afghanis, what we have here is conversion, which is a very different process, that's directly, there's no U.S. financial institution intermediary involved with a depository account that's purchased this currency, instead it's the core saying, okay, we have Amran's owed, say, a million dollars, please use the three-day rate to convert that into Afghanis, and so that is transferred into Afghanis into Amran's bank account, the three-day rate, so that's what we have. Is there anything in the regulations at all that discusses posting of rates? I'm not aware of anything in the DOD financial regulations that specifically discuss the posting of rates, the only the, no, Your Honor, I'm not aware of that. Okay, you're way over time. I see that I'm way over time. We'll restore your full five minutes so that we keep it fair. I'd like to draw the court's attention to appendix page 108, and this is second, the first actually, affidavit of Lieutenant McManus and paragraph four states that the 159th FMSD serves as one of two currently existing Army finance offices located in Afghanistan. So in fact, Your Honor, the evidence suggests that there were two at one time. I'm not sure what the other office was posting, that's not a fact and evidence, but it's certainly one that would be helpful to determining a fair and equitable result in this case. As the court just heard... What equitable result are you looking for in this case? Again, Your Honor, we believe that the prevailing rate... The answer is $1.5 million, right? Yes, the answer is $1.5 million. When you signed on to the, when you submitted your bid, how did you know you were going to come out that that $1.4 million was going to be paid to you? You agreed that you would get it at a specific rate. At that time, nobody knows what that rate's going to be. We... Our central position, Your Honor, is that the rate should be based on something. It shouldn't just be this magical... It was based on the three-day rate, which, in fact, you were entitled to the five-day rate, but you got the three-day rate, so you're ahead of the game, not behind. What equitable... Where have you been harmed? I've read through your brief very carefully, and it seems to me that you brought an appeal based on principle. You want there to be an admission, that there's an ambiguity, that there was an error. That's been admitted to, that's been acknowledged, but when it comes down to it, there was a prevailing rate, I mean, a posted rate. That rate was a five-day rate. You got paid the three-day rate. You got paid more than what you should have. What's the appeal here? No, thank you for that question, Your Honor. We... Our question in return would be, the three-day rate is based on what? Is it a market-based rate? Is it based on the acquisition costs of the government? Is this money in, money out? And so far, we've seen no evidence... It's not a question... Your appeal's not a question whether something is publicly posted or not, or whether it's available to you, or not. The problem you're having is, how did they actually... What's the financial computation used in order to arrive at that rate? That's what you would like to be disclosed. That's certainly a large portion of it, Your Honor. We know what the prevailing rate is, and it's more favorable to us. If the government is paying something else, then we would certainly like to know what that is. The quarterly rates are based on the purchase of something for Afghani, meaning they must acquire Afghani at some point. There's a cost. This is not about acquisition. It's not about buying currencies. It's about converting currencies. It's about fairness, Your Honor. If the government is receiving a certain rate to get Afghani, and to pay us in that currency, and we're seeing something different, then that doesn't seem to be fair to the contractor in this position, especially... Are you saying that the contract should have actually said, we're going to pay you at a non-market rate? No, Your Honor. I think the contract, if it was trying to be clear, would say what the current contract clause says, that the rate will be, and there's a blank space to post that rate so that every party is on the same page about what's going to be applied during the pendency of the contract. But you didn't inquire at the time of the bid, did you, as to what all that language about local DOD finance office meant? No, Your Honor. Again, we would posit that isn't a patent ambiguity, and we had no reason to question it until we received money that wasn't tied to anything we had notice of. Now, reading your brief, I do understand well the argument that you're making, that there should be some fairness involved so all parties should know what the rate is. And that seems to me to be one of the principal arguments that you're making. That's almost what your appeal is about. Correct. That fairness. You're looking for fairness. Okay. This is a court of law. We look at controversies. And the Court of Federal Claims basically said that you have no damages here. Because even at this point, you're not alleging damages, that you've been you should have gotten a certain rate, but you didn't. You're just saying it wasn't fair however way they came about it. But the fact is that you did get a rate. That rate was a three-day rate. The facts and the records show you should have gotten a five-day rate. You got more than what you should have. Where's your appeal? Where's your damage? I would say, Your Honor, it is in a dichotomy between three-day and five-day. The question is we have a prevailing rate that's more favorable. We were paid less. And why is that? Why are we restricting it to these three-day  even than the three-day rate? Correct, Your Honor. More favorable than the three-day rate. What rate was that? Pardon me, Your Honor? Which was the most favorable rate? The treasury quarterly rates, Your Honor. The acquisition rate? The acquisition rate was the most favorable. But this is not an acquisition matter. This is a conversion. When you signed, when you submitted your bid, you agreed to be paid in Afghanis. That's a conversion matter. And if the government incurs any cost for that conversion that relates to dollars and cents, we would love to see that, Your Honor. It isn't in evidence. We know that the three-day rate is a number. You put in the dollars in ITS.gov and it generates a separate number. And we don't know what's behind that black box. We have no idea. Thank you. The cases will be submitted. We thank counsel. This court is adjourned.